IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK09-41726-TJM |
| | ) | |
| ROYCE ALAN KENNICUTT, | ) | CH. 7 |
| | ) | |
| Debtor(s). | ) | |
| TODD WENDELL and LORIE WENDELL, | ) | ADV09-4060-TJM |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROYCE ALAN KENNICUTT, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Trial was held in North Platte, Nebraska, on July 1, 2010, regarding the complaint requesting a judgment of non-dischargeability under 11 U.S.C. § 523(a)(2)(A) filed herein. Brian Koerwitz appeared for the plaintiffs and James Bocott appeared for the defendant

FACTS

The debtor, Royce Kennicutt ("Kennicutt"), was in the business of selling and constructing steel buildings, usually for use by farmers and ranchers. The business grew quickly from six or eight jobs in 2005 to twelve jobs in 2006, to twenty jobs in 2007, and more than twenty in 2008. In 2008, he ran into financial difficulties when storms destroyed partially finished buildings on which he did not have insurance. He was required to purchase material for the buildings twice and to build them twice. He was not able to charge his customers for the rebuilding so he became short of cash by $150,000 to $200,000. He owed suppliers, sometimes paid with bad checks and sometimes paid with checks that overdrew the bank account, but the bank covered.

In November or December of 2008, he was contacted by the Wendells concerning building a large horse barn on their land. He told them that he was a dealer for Midwest Buildings, a company that designed and manufactured the steel building and delivered it to the job site. He then would construct the building from the materials provided by Midwest Buildings. The Wendells were familiar with the type of building known as "Morton." The advertising material provided by Kennicutt made Midwest Buildings seem to be comparable to a Morton building. The main difference between the types of buildings was that the Morton buildings and the buildings of other manufacturers were not attached to a concrete foundation, whereas the Midwest building was. Since the Wendells wanted a concrete foundation, they decided to go with Kennicutt based upon the representations mentioned above.

Kennicutt told them that if they paid before December 31, 2008, Midwest Buildings would give them a discount. Although Kennicutt required only a $40,000 down payment, the Wendells decided to pay the full amount of the contract price and delivered a check written to Midwest Buildings for $60,922 on or about December 30, 2008. The check was endorsed by Kennicutt in

his business name and by him in the name of Midwest Buildings. It was deposited in his business account.

Due to his financial condition at the time he accepted the check from the Wendells, the proceeds of the check, when deposited in his account, managed only to bring the account balance to a little over $28,000. That amount was insufficient to finance the purchase of the material necessary to build the steel building ordered by the Wendells.

Sometime during the late winter and early spring of 2009, Kennicutt's bank called his note obligations due and exercised its rights under its security agreements and picked up Kennicutt's equipment which was collateral for his loans. As a result, he did not have any equipment available to build the building.

As it turns out, there was no manufacturing company named Midwest Buildings that Kennicutt was the dealer for. He never intended to purchase a building from such a manufacturing company. If he had had the money and equipment, he would have purchased the steel from one company, purchased trusses from another company, and purchased other materials necessary for constructing the building from whatever companies he could obtain the best price.

He never did order or purchase any materials for the Wendells' building.

He returned none of the money he received from the Wendells.

## CONCLUSIONS OF LAW AND DISCUSSION

The Bankruptcy Code prohibits the discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]" 11 U.S.C. § 523(a)(2)(A). To establish fraud within the context of § 523(a)(2)(A), the creditor must show, by a preponderance of the evidence, that: (1) the debtor made a representation; (2) the representation was made at a time when the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained a loss as the proximate result of the representation having been made. R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010).

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." Merchants Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (quoting RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995)). "A 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression." Moen at 791 (quoting In re Guy, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." Moen at 791 (quoting In re Malcolm, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). False representations may be by omission or commission. Caspers v. Van Horne (In re Van Horne), 823 F.2d 1285, 1288 (8th Cir. 1987), abrogated on other grounds, Grogan v. Garner, 498 U.S. 279 (1991). A "misrepresentation" is "not only words spoken or written but also

any other conduct that amounts to an assertion not in accordance with the truth." Moen at 791 (quoting LA Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 308-09 (Bankr. M.D. La. 1998)). A debtor's silence regarding a material fact may constitute a false representation actionable under § 523(a)(2)(A). Fee v. Eccles (In re Eccles), 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009).

A material promise to perform in the future "made with the intent to defraud and without the intent to perform . . . constitutes actionable fraud." Freier, 604 F.3d at 588 (quoting McDonald v. Johnson & Johnson, 722 F.2d 1370, 1379 (8th Cir. 1983)).

"Justifiable reliance" is the appropriate standard to apply under § 523(a)(2)(A), and is a lower standard that "reasonable reliance," entailing no duty to investigate. Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 423 B.R. 309, 314 (B.A.P. 8th Cir. 2010) (citing Field v. Mans, 516 U.S. 59 (1995)). However, a creditor cannot rely upon false representations if the falsity is obvious. Id. at 315. A statement by the debtor that he does not intend to pay the debt is an obvious warning sign of falsity, but "repeated requests to postpone payment, without more, do not rise to the level of obvious warning signs of falsity." Id.

Although at trial Kennicutt denied that he ever claimed to be the dealer for Midwest Buildings or that Midwest Buildings was a company located in Topeka, Kansas, his trial testimony was inconsistent with his testimony during a deposition taken on September 1, 2009. In it, he admitted that he intentionally led the Wendells to believe Midwest was a building manufacturer, that it would supply the building, and that it was located in Topeka, Kansas. He admitted on direct examination in his case in chief that he frequently represents himself as Midwest Buildings because he thinks potential customers will be more willing to deal with him if they think there is a larger company backing his services.

Kennicutt made several false representations. They include: stating he was a dealer for Midwest Buildings; stating that Midwest Buildings was a commercial supplier of pre-manufactured buildings; stating that Midwest Buildings was located in Topeka, Kansas; stating that the Wendells would receive a discount from Midwest Buildings if they paid for their order prior to the end of the year; and, finally, after receiving the check from the Wendells and depositing it into his account, stating that he had placed an order for the building when no such order had been placed.

Each time Kennicutt made the misrepresentations, he knew the misrepresentations were false.

Kennicutt made the representations with the intent to deceive the plaintiffs. He acknowledged under oath that he had told them about the company in Topeka, Kansas, that would be manufacturing and delivering their building. He wanted them to believe that there was a company that would provide a building package in a manner similar to that which Morton would have provided, rather than have them believe that the company they were dealing with was just him.

Plaintiffs justifiably relied upon the representations made by Kennicutt and they suffered damages in the amount of $60,922.

Kennicutt testified that at all times in his discussions with the Wendells, after his receipt and deposit of their check, and until the bank took his equipment, he intended to build the building for

the Wendells. His stated intent is inconsistent with his financial situation. During 2008, and particularly at the end of 2008, he was in a cash flow squeeze. He had written a number of bad checks, some of which caused him to have to deal with the county attorneys in a number of counties. He owed suppliers significant amounts of money. Even after he deposited the check from the Wendells, his account balance was less than $30,000, significantly less than what it would cost to purchase the materials or pay labor to construct the building.

      He testified that he had ongoing jobs at the time he accepted the check from the Wendells and he anticipated those jobs would eventually provide him with sufficient funds to enable him to construct the building for the Wendells. However, he admits that, shortly after he accepted and deposited the Wendells' check, he was unable to complete a job that would have paid him $30,000, because he was unable to come up with $800 necessary to purchase the final materials.

      He may have had the subjective intent, based upon wishful thinking, to complete the Wendells' construction. However, he had to know, based upon his overdrafts and his bank balances, that it was unlikely he would be able to finance the purchase of the materials and pay the necessary labor to complete the project.

      From Kennicutt's written advertising materials and his oral statements, the Wendells justifiably relied, to their detriment, on the fact asserted by Kennicutt that there actually was a company that would manufacture the product they were purchasing and deliver it to the site.

      The Wendells have presented sufficient evidence that they were induced to pay Kennicutt $60,922 based upon intentional misrepresentation. Therefore, the Kennicutt debt to the Wendells in the amount of $60,922 is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). A separate judgment shall be entered.

      DATED:     July 22, 2010

                                                           BY THE COURT:

                                                       /s/ Timothy J. Mahoney
                                                       United States Bankruptcy Judge

Notice given by the Court to:
     James Bocott
     Brian Koerwitz
     U.S. Trustee